**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

                              Plaintiff,

        - v -                                          Civ. No. 1:03-CV-00951
                                                              (RFT)

TIMMONS CORPORATION, DONALD W. STONE, SR.,
and REAL PROPERTY LOCATED at 191 WATERVLIET
SHAKER ROAD, COLONIE, ALBANY COUNTY, NEW
YORK,

                              Defendants.


**APPEARANCES:**                                **OF COUNSEL:**

OFFICE OF UNITED STATES ATTORNEY-ALBANY          JAMES C. WOODS, ESQ.
Attorney for Plaintiff                           Assistant United States Attorney
James T. Foley Courthouse
445 Broadway
218 James T. Foley Courthouse
Albany, N.Y. 12207-2924


U.S. DEPARTMENT OF JUSTICE                        RUTH A. McQUADE, ESQ.
Attorney for Plaintiff
Environmental Enforcement Section
P.O. Box 7611
Washington, D.C. 20044-7611


U.S. DEPARTMENT OF JUSTICE                        ALFRED S. IRVING, ESQ.
Attorney for Plaintiff
Environment & Natural Resources Division
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611


OFFICE OF RICHARD P. FEIRSTEIN                    RICHARD P. FEIRSTEIN, ESQ.
Attorney for Defendants
600 Broadway
Albany, N.Y. 12207-2205


**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## MEMORANDUM DECISION and ORDER[1]

Plaintiff, the United States of America ("USA"), brings suit alleging violations of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, in particular §§ 9604 & 9607. Dkt. No. 1, Compl. at ¶ 1. Pursuant to the CERCLA claim, Plaintiff seeks a response to the Environmental Protection Agency's ("EPA") Request for Information ("Request"), a civil penalty for failure to previously respond to the EPA's Request for Information, cost recovery against Timmons Corporation ("Timmons"), judgment *in rem* against real property located at 191 Watervliet Shaker Road, Colonie, Albany County, New York ("Real Property") for costs expended by the United States in connection with the Adirondack Steel Superfund Site, and to strike affirmative defenses asserted by the Defendants. Plaintiff brings this Motion for Summary Judgment pursuant to FED. R. CIV. P. 56(b). Dkt. No. 20.

## I.  FACTS

The following facts present no genuine issues of material fact.[2]  Timmons' principle place of business is the current residence of Defendant Donald W. Stone, Sr. ("Stone"). Dkt. No. 20, Pl.'s 7.1 Statement at ¶ 1. Stone is the current President and owner of Timmons.[3] *Id.* at ¶ 6.

---

[1] Pursuant to 28 U.S.C. § 636(c), FED. R. CIV. P. 73, and N.D.N.Y.L.R. 72.2(b), the parties have consented to disposition of this matter by the undersigned. Dkt. No. 5.

[2] Defendants had previously attempted to file an opposition to the Motion for Summary Judgment, which was tardy and rejected by this Court for failing to comply with the Federal Rules of Civil Procedure and the Local Rules for the Northern District of New York ("Local Rules"). Dkt. No. 24, Text Order, dated July 29, 2005. On August 5, 2005, Defendants filed a response opposing the Motion for Summary Judgment. Dkt. No. 26. Although Defendants' response, once again, inexplicably fails to comport with the Federal Rules of Civil Procedure and the Local Rules, this Court, nonetheless, will proceed to decide this Motion with whatever Defendants have submitted. However, this Court is bewildered by the fact that no Memorandum of Law was filed nor was the required Statement of Material Facts filed pursuant to the Local Rules. N.D.N.Y.L.R. 7.1(a). The absence of these two documents would be sufficient reason to reject, once again, Defendants' submission. Since no Statement of Material Facts were filed by the Defendants, Plaintiff's Statement of Material Facts are therefore deemed admitted. N.D.N.Y.L.R. 7.1(a)(3).

[3] Stone also owns one hundred (100) percent of the stock in Timmons. Pl.'s 7.1 Statement at ¶ 8.

On March 15, 1989, Timmons purchased the Real Property from the bankruptcy estate of the Adirondack Steel Casting Company, Inc., along with a larger parcel of land consisting of approximately one hundred and sixty-three (163) acres.  *Id.* at ¶¶ 3 & 4; Dkt. No. 20, Deed, App. 4; Dkt. No. 20, Discharge of Mortgage, App. 5; Dkt. No. 20, Tracy A. Silk Lt., dated Oct. 6, 1999, App. 6; Dkt. No. 20, Donald Stone, Sr. Aff. ("Stone Aff. I"), dated Apr. 12, 2005, App. 24.  In 1998, Timmons sold one hundred and twenty-four (124) adjoining acres to two different corporations.[4]  Pl.'s 7.1 Statement at ¶ 4.  In 1999, one (1) acre was sold to a third company.[5]  *Id.* The Real Property owned by Timmons is located on the remaining thirty-eight and a half (38.5) acres.  *Id.* at ¶ 10.  The Real Property contains a vacant building, formerly used as a steel foundry, consisting of electrical transformers used to "power electric arc furnaces," as well as several other buildings leased to commercial tenants.  *Id.* at ¶ 11; Dkt. No. 20, 1993 EPA Action Mem., dated Feb. 5, 1993, App. 14 at pp. 2-3; Dkt. No. 20, Site-Specific Plan by Wehran, dated May 1995, App. 41.

When the Real Property was purchased by Timmons, the electrical transformers were already on the property.[6]  Pl.'s 7.1 Statement at ¶ 12.  In September 1988, the Real Property was assessed by civil engineers with a recommendation that the transformers be removed and disposed.  *Id.* at ¶ 22; Dkt. No. 20, Scalise-Knysh Report, App. 13 at p. 10.  In March 1989, prior to Timmons'

---

[4] Sixty-six (66) acres were sold for $960,000 and fifty-eight (58) acres were sold for $975,000.  Pl.'s 7.1 Statement at ¶¶ 56 & 57.

[5] The acre was sold for $50,000.  Pl.'s 7.1 Statement at ¶ 61.  Additionally, on July 22, 1999, Timmons "cancelled its debt of $2,093,671.70 owed to Bank of New England."  *Id.* at ¶ 59.  Subsequently, on March 29, 2000, Timmons sold fifty acres of another property in New Hampshire for $660,000.  *Id.* at ¶ 60.

[6] The number of transformers is not noted, however, the transformers located in the northern transformer substation were large, weighing approximately 73,610 pounds.  Pl.'s 7.1 Statement at ¶ 14.

purchase of the Real Property, an environmental assessment report was given to Timmons stating

that fluid in the transformers contained polychlorinated biphenyls ("PCBs").  Pl.'s 7.1 Statement at

¶ 15; Dkt. No. 20, Goldberg-Zoino Report, App. 12 at p. 41.  Timmons, consistent with good

practice, examined both reports prior to purchase.  Pl.'s 7.1 Statement at ¶ 23; Dkt. No. 20,

Interrogatory Response, App. 10 at ¶ 5.

  Most transformers located in the northern substation contained PCB labels.  Pl.'s 7.1

Statement at ¶ 19; Goldberg-Zoino Report at pp. 7-8.  PCBs are classified as a hazardous substance

under CERCLA.  Pl.'s 7.1 Statement at ¶ 36.  In March 1989 and August 1992, there was noticeable

staining on the lower portions of the transformers as well as on the ground; the March 1989

assessment described the area around the transformers as a "hot spot;" and prior to July 6, 1992,

large quantities of fluid from the transformers were released into the environment.  Pl.'s 7.1

Statement at ¶¶ 20 & 25; Goldberg-Zoino Report at p. 21; Dkt. No. 20, Dilshad Perera Decl., dated

June 29, 2005, App. 31 at ¶ 11; Dkt. No. 20, 1992 EPA Action Mem., dated Aug. 14, 1992, App. 15

at p. 1; Site-Specific Plan by Wehran; Dkt. No. 20, EPA Initial Pollution Report, dated Aug. 17,

1992, App. 44.  On July 6, 1992, the New York State Department of Environmental Conservation

("NYSDEC") identified areas on the Real Property that were contaminated with the PCB laden

fluid.  Pl.'s 7.1 Statement at ¶ 33; 1992 EPA Action Mem. at ¶ II.B; 1993 EPA Action Mem. at p. 2;

Perera Decl. at ¶¶ 7 & 11.  Concrete pads supporting the transformers had been soaked with the

fluid that ultimately spilled into the nearby soil.  Pl.'s 7.1 Statement at ¶ 33; 1992 EPA Action

Mem. at ¶ II.B; 1993 EPA Action Mem. at p. 2; Perera Decl. at ¶¶ 7 & 11.  NYSDEC, in 1992,

measured soil samples for PCBs[7] and the EPA did the same in 1993.[8]  Pl.'s 7.1 Statement at ¶¶ 34 &

35; 1993 EPA Action Mem. at p. 5; Dkt. No. 20, NYSDEC Lt. to Stone, dated Aug. 4, 1992, App.

22.

   On July 6, 1992, NYSDEC requested that the EPA begin a removal action pursuant to

CERCLA on the Real Property.  Pl.'s 7.1 Statement at ¶ 37; 1992 EPA Action Mem.; 1993 EPA

Action Mem.; Dkt. No. 20, EPA Progress Pollution Report I, dated Mar. 15, 1993, App. 45; Dkt.

No. 20, EPA Progress Pollution Report II, dated Oct. 29, 1993, App. 46; Dkt. No. 20, NYSDEC Lt.

to EPA, dated Aug. 23, 1996, App. 50.  The removal process commenced in 1992 and concluded,

seven years later, in December 1999.  Pl.'s 7.1 Statement at ¶ 37.  During the removal process,

particularly in 1993, it was confirmed that the soil surrounding the northern transformers was

stained with PCBs.  *Id.* at ¶ 24.

   In February 1993, the EPA contacted Timmons to negotiate the removal action.  *Id.* at ¶ 38;

Dkt. No. 20, EPA Lt. to Timmons I, dated Feb. 1, 1993, App. 48; Dkt. No. 20, EPA Lt. to Timmons

II, dated Sept. 29, 1994, App. 18.  Negotiations failed and on September 30, 1994, the EPA

effectuated an Administrative Order obligating Timmons to remove the PCBs from the Real

Property.  Pl.'s 7.1 Statement at ¶¶ 38 & 39; Dkt. No. 20, Administrative Order, App. 39.  Although

Timmons performed some of the removal, the Defendant failed to fully comply with the

_____

   [7] The PCB content measured by NYSDEC were "as high as 299 ppm and soil samples at one foot depth [were]
as high as 159 ppm."  Pl.'s 7.1 Statement at ¶ 35.  Additionally "as much as 3,000 gallons of dielectric fluid with PCB
content as high as 25% had been spilled at the site."  *Id.*  The Defendants state that the 3,000 gallons figure was a
numerical mistake and instead should have been 30 gallons.  Dkt. No. 26, Donald W. Stone, Sr. Aff. ("Stone Aff. II"),
dated Aug. 5, 2005, at ¶¶ 11 & 12.

   [8] The PCB content measured by the EPA in the soil had "concentrations up to 42,435 [] ppm" and the
"sediment samples indicated 4.2 ppm[.]"  Pl.'s 7.1 Statement at ¶ 34.  Sampling inside the building showed "PCB
concentrations of 28,853 ppm."  *Id.*

Administrative Order.  Pl.'s 7.1 Statement at ¶ 39; Dkt. No. 20, EMCON/Wehran-NY Lt. to EPA

and NYSDEC I, dated Aug. 9, 1995, App. 42; Dkt. No. 20, EPA Lt. to Stone and Timmons, dated

Mar. 2, 1995, App. 49; Dkt. No. 20, NYSDEC Lt. to EPA, dated Mar. 8, 1995, App. 51;

EMCON/Wehran-NY Lt. to EPA and NYSDEC II, dated June 22, 1995, App. 43.  The EPA,

therefore, conducted the remainder of the removal activities, consistent with the National

Contingency Plan ("NCP"),[9] and completed the action on December 4, 1999.  Pl.'s 7.1 Statement at

¶ 41; Dkt. No. 20, Notice Lt., dated Oct. 31, 2001, App. 16 at p. 1; Perera Decl. at ¶¶ 8 & 14.

These removal measures were required because of the risk to the public.  Pl.'s 7.1 Statement

at ¶ 40; 1993 EPA Action Mem. at pp. 6-7.  A chain linked fence surrounded only a portion of the

property lending the Real Property to be trespassed upon, trucks being burned on the Real Property,

windows being broken on certain buildings, and the property otherwise being vandalized.  Pl.'s 7.1

Statement at ¶¶ 26, 27, 28, & 32; Interrogatory Response at ¶¶ 3, 11, & 12; Dkt. No. 20,

Environmental Services Report, dated Mar. 28, 1995, App. 19 at p. 1.  Additionally, the Real

Property is surrounded by residential areas, a school, and nearly 9,500 people live within a mile of

the Real Property.  Pl.'s 7.1 Statement at ¶ 29; 1993 EPA Action Mem. at p. 6.  Many people,

including children and dirt-bike riders, were exposed to the contaminated property.  Pl.'s 7.1

Statement at ¶¶ 30, 31, & 32; 1993 EPA Action Mem. at p. 6; Environmental Services Report at p.

1.  Costs were incurred by the EPA for the removal including labor, travel, work performed by

contractors, and indirect costs.  Pl.'s 7.1 Statement at ¶¶ 63 & 64-172; Perera Decl. at ¶¶ 14 & 15;

---

[9] *See* 40 C.F.R. § 300.415(b).

Dkt. No. 20, Jo-Ann Velez Decl., dated June 28, 2005, App. 28 at Ex. 1.[10]

On October 23, 2000, the Defendants were sent a Request for Information by the EPA, which sought a plethora of information, including information concerning the purchase of the Real Property and financial information about Timmons' and Stone's ability to pay for the removal performed by the EPA, for which a response was due within twenty-one (21) days.[11]  Pl.'s 7.1 Statement at ¶ 42; Notice Lt. at p. 3; Dkt. No. 20, EPA Request for Information Lt., dated Oct. 23, 2000, App. 17.  Timmons and Stone did not comply with the Request until approximately October 2003, three years later.  Pl.'s 7.1 Statement at ¶¶ 44 & 45.  When they did respond, the only information provided were tax returns for the years 2003-2005 and some other financial statements

---

[10] Direct costs by the EPA total $771,680.52 and indirect costs total $210,073.24 for a combined total of $981,753.76.  Pl.'s 7.1 Statement at ¶¶ 130, 149, & 150.  The costs incurred by the Department of Justice Environment and Natural Resources Division total $191,346.52.  *Id.* at ¶ 171.  In addition to the costs, interest beginning on October 31, 2001 to June 30, 2005 total $73,299.71.  *Id.* at ¶ 176.  The sum for all expenses including interest is $1,246,399.99.

[11] The following were the questions asked in the Request:

a. The identity and whereabouts of all past and present officers, directors, and shareholders of Timmons. b. A schedule of all property owned and sold by the company.  c. The most recent real estate appraisal of the Site.  d. Identify all spills, leaks, releases or threats of releases of hazardous materials on the Site, including cause of the release, form of the release, where on the Site the release occurred, the surface on or into which the material was released, and all persons with information about each release.  e. Describe in detail all waste materials removed from the Site, including the source, chemical composition, and method of disposal.  f. Describe in detail all inquiries made about contamination on the property prior to purchasing it.  g. Describe all contacts with governmental entities regarding possible environmental violations on the Site prior to purchasing it.  h. Describe in detail how the sampling mentioned in the pre-purchase Site Inspection was performed. Describe in detail other Site examinations conducted before and after Timmons purchased the Site.  i. What contractual obligations Timmons and Stone had with the prior Site owners.  j. Describe cost and detail and status of all environmental activities conducted by Timmons at the Site.  k. Provide all federal and state tax returns and financial projections and reports for Timmons during the past three years.  l. Identify loans and other borrowing and financing by Timmons and Stone during the last three years.  m. Identify all persons who helped prepare the answers to the Request for Information, and all documents consulted when preparing the answers.  n. If any requested documents are unavailable, please explain why.
Pl.'s 7.1 Statement at ¶ 43.

during that same time period.[12]  *Id.* at ¶ 46.

On October 31, 2001, the EPA sent to Timmons and Stone a "Notice Of Potential Liability, A Demand For Reimbursement, A Notice Of EPA's Intent To File A Lien, And A Notice Regarding Timmons' Failure To Respond To The October 23, 2000 Information Request Letter," which were received by Defendants on November 2, 2001.  *Id.* at ¶¶ 48 & 174; Notice Lt.  At that time, EPA's counsel had given Timmons and Stone a two-week extension to respond to the Request; however, no response was received.  Pl.'s 7.1 Statement at ¶¶ 48 & 174.  The Notices allowed Timmons to seek a conference or submit the information, but neither was done and the Notice of Lien on the Real Property, which was to secure payment of response costs, was filed on December 10, 2001.  *Id.* at ¶¶ 49, 50 & 175.  On October 21, 2002, the Department of Justice ("DOJ") further requested Timmons and Stone to provide financial information that would comply in part with the Request.  *Id.* at ¶ 51.  The DOJ made that same request again on May 19, 2003, June 26, 2003, and July 8 and 25, 2003, to no avail.  *Id.* at ¶¶ 52-55.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact.  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v.*

---

[12] Timmons and Stone did not comply with questions a-f, h-j, l, and n.  Pl.'s 7.1 Statement at ¶ 47 & n.11.

*Catrett*, 477 U.S. 317, 323 (1986)).  "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party."  *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party.  FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).  To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact.  *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this

point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Moreover, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## B. CERCLA LIABILITY

The USA claims that Timmons is liable under CERCLA for costs associated with the removal action. Compl. at ¶ 40. Plaintiff seeks all costs associated with the removal action plus prejudgement interest. *Id.* at ¶ 40. The Defendants claim that they were not the owners or operators of a facility when hazardous substances were disposed of and as a counterpoint they assert that the USA is a potentially responsible party as they "sold this [Real Property] after World War II" without testing for contamination of PCBs in the 1940's and therefore cannot recover damages. Dkt. No. 3, Answer; Dkt. No. 26, Donald W. Stone, Sr. Aff. ("Stone Aff. II"), dated Aug. 5, 2005, at ¶¶ 2 & 5. Defendants further allege that the transformers were used by the prior owner, the Adirondack Steel Casting Company, Inc. Stone Aff. II at ¶ 6. Although they were never used by Timmons, the transformers were not abandoned by Timmons and remain available for use by proposed tenants. *Id.*

CERCLA was created due to environmental and public health concerns as a result of "the release of hazardous substances" and a fund was established to remove hazardous substances at contaminated sites. *United States v. Ponderosa Fibres of Am., Inc.* 178 F. Supp. 2d 157, 160 (N.D.N.Y. 2001).

In order to establish a prima facie case of liability under CERCLA, the plaintiff must prove: 1) the site is a "facility" as defined in CERCLA, 2) a release or threatened release of a

> hazardous substance has occurred, 3) the release or threatened release has caused the plaintiff to incur response costs that were necessary and consistent with the National Contingency Plan[13] set up by CERCLA, and 4) the defendants fall within one or more of the four classes of responsible persons described in CERCLA § [9607](a).

*Freeman v. Glaxo Wellcome, Inc.*, 189 F.3d 160, 163 (2d Cir. 1999) (citations omitted).

CERCLA authorizes a lawsuit against one who is "the owner and operator of a vessel or a facility[.]" 42 U.S.C. § 9607(a)(1). Furthermore, if a party falls within § 9607(a)(1), strict liability will be imposed. *See Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 327 (2d Cir. 2000) (citation omitted); *Cooper Indus., Inc. et al. v. Agway, Inc. et al.*, 1997 WL 135925, at *3 (N.D.N.Y. Mar. 13, 1997). When a party falls within the ambit of § 9607(a)(1), liability will be imposed "on current owners of a site even if the disposal of the substances occurred before the commencement of ownership and the owner has not been shown to have caused a release." *United States v. Manzo*, 182 F. Supp. 2d 385, 397 (D.N.J. 2001) (citing *New York v. Shore Corp. Realty*; 759 F.2d 1032, 1042-44 (2d Cir. 1985)); *see also United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1507 (6th Cir. 1989); *United States v. JG-24, Inc.*, 331 F. Supp. 2d 14, 62 (D.P.R. 2004) (citing *Manzo*) (further citation omitted) (42 U.S.C. § 9607(a)(1) imposes liability on the current owner of a facility "regardless of when disposal occurred and regardless of causation"); *New York v. Westwood-Squibb Pharm. Co.*, 138 F. Supp. 2d 372, 378 (W.D.N.Y. 2000) (citing *United States v. Monsanto Co.*, 858 F.2d 160, 169 (4th Cir. 1988) which held "site owners liable regardless of degree of participation in disposal of hazardous wastes"); *New Jersey Tpk. Auth. v. PPG Indus.*, 16 F. Supp. 2d 460, 467-68 (D.N.J. 1998).

A "facility" includes a building, structure, or "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. §

---

[13] *See* 42 U.S.C. § 9605.

9601(9).[14]  In order to determine whether the second prong has been fulfilled, the first step is to

define what constitutes a hazardous substance.[15]  Although numerous substances can be defined as

hazardous, "PCBs are listed among the 700 substances which the EPA has designated as hazardous

for purposes of CERCLA" pursuant to 42 U.S.C. § 9602.  *Mainline Constructing Corp. v. Chopra-*

*Lee, Inc. et al.*, 109 F. Supp. 2d 110, 121 (W.D.N.Y. 2000) (citing Table 302.4, 40 C.F.R. § 302);

*see generally United States v. Alcan Aluminum Corp.* ("*Alcan II*"), 315 F.3d 179 (2d Cir. 2003).  In

finding a hazardous substance, liability can be established even when the substances are found

below the ground, thus "reaffirming the principle that quantity or concentration is not a factor in

interpreting CERCLA's definition of hazardous substances."  *United States v. Alcan Aluminum*

*Corp.* ("*Alcan I*"), 97 F. Supp. 2d 248, 275 n.31 (N.D.N.Y. 2000) (citations and internal quotation

marks omitted).

---

[14] 42 U.S.C. § 9601(9) states in full:

The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

[15] Pursuant to 42 U.S.C. § 9601(14):

The term "hazardous substance" means (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921(but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

If a suit is authorized under § 9607(a), the party will be liable for "all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan[,] . . . any other necessary costs of response . . .[,] . . . damages for injury to, or destruction of, or loss of natural resources including the reasonable costs of assessing" such damages, and costs for any health studies. 42 U.S.C. § 9607(a)(4)(A)-(D). "Response" refers to a removal action including "enforcement activities related thereto." *Id.* at § 9601(25). Removal means "the cleanup . . . of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances," as well as the disposal of those materials. *Id.* at § 9601(23).

In terms of liability for "all costs" of a removal action, the government need not minimize its costs, to the contrary, the costs must only conform to the NCP. *State of New York v. Green et al.*, 420 F.3d 99, 109 (2d Cir. 2005) (citing *In re Bell Petroleum Servs., Inc.*, 3 F.3d 889, 906 n.22 (5th Cir. 1993) which held that "all costs incurred by government that are not inconsistent with the national contingency plan are presumed reasonable"). Therefore, it is incumbent upon the defendant to bear the burden "'of proving inconsistency [with the NCP], and [the defendant] must show that the EPA acted arbitrarily and capriciously in choosing a particular response action.'" *United States v. E.I. Du Pont De Nemours & Co., Inc.*, 341 F. Supp. 2d 215, 232 (W.D.N.Y. 2004) (quoting *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 528 (2d Cir. 1996)).

The EPA's "oversight costs are recoverable as response costs under CERCLA." *United States v. 175 Inwood Assocs., LLP*, 330 F. Supp. 2d 213, 234 (E.D.N.Y. 2004). Investigative and sampling costs are recoverable as well. *Alcan I*, 97 F. Supp. 2d at 275. Additionally, attorneys'

*-13-*

fees, indirect administrative costs, studies conducted for remediation, and prejudgment interest are all considered to be recoverable. *E.I. Du Pont*, 341 F. Supp. 2d at 239. Moreover, DOJ enforcement costs are "recoverable under CERCLA [§ 9607]." *Id.* at 240. Once a prima facie case for enforcement costs incurred by the DOJ has been established, then "'the burden will be on the CERCLA defendant to demonstrate that such documentation is inadequate[.]" *Id.* at 246 (quoting *United States v. W.R. Grace & Co.-Conn. et al.*, 280 F. Supp. 2d 1149, 1181 (D. Mont. 2003)). And under the NCP, the lead agency need only supply documentation that is "sufficient to provide . . . accurate accounting of federal, state, or private party costs incurred for response actions[.]" 40 C.F.R. § 300.160(a)(1).

Furthermore, if a plaintiff were to establish a prima facie case of liability "'on undisputed facts, and the defendant is unable to demonstrate by a preponderance of the evidence the existence of one of the three affirmative defenses [under 42 U.S.C. § 9607(b)], then [a plaintiff is] entitled to summary judgment on the issue of liability, even when genuine issues of material fact remain as to appropriate damages.'" *Cooper Indus., Inc.*, 1997 WL 135925, at *2 (quoting *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2d Cir. 1993)) (further citation omitted).

Here, Timmons is a facility as defined under CERCLA pursuant to the first element needed to establish liability. Timmons is located in a vacant building on the Real Property, an area where a hazardous substance was placed or otherwise came to be located. Pl.'s 7.1 Statement at ¶ 11; 1993 EPA Action Mem. As noted previously, PCBs are considered hazardous substances and were found on the Real Property around the transformers and in the soil. *See Mainline Constructing Corp.* 109 F. Supp. 2d at 121; Pl.'s 7.1 Statement at ¶¶ 20, 25, & 33; Goldberg-Zoino Report at p. 21; Perera Decl. at ¶¶ 7 & 11; 1992 EPA Action Mem. at p. 1 & ¶ II.B; Site-Specific Plan by Wehran; EPA

*-14-*

Initial Pollution Report; 1993 EPA Action Mem. at p. 2.  We note that the transformers, which contained fluid contaminated with PCBs, were on the property prior to the purchase by Timmons. Pl.'s 7.1 Statement at ¶ 15.  Therefore, the first element is satisfied.

The second element that a release or threatened release of the hazardous substance occurred has also been established.  In 1989, Timmons purchased the Real Property.  Stone Aff. II at ¶ 1. Since that time, both NYSDEC and the EPA, in 1992 and 1993 respectively, conducted assessments that revealed that fluid from the transformers were released into the environment and into the surrounding soil, thus creating "hot spots."  Pl.'s 7.1 Statement at ¶¶ 18, 20, 25, 33, 34, & 37; Goldberg-Zoino Report at p. 21; Perera Decl. at ¶¶ 7 & 11; 1992 EPA Action Mem. at p. 1 & ¶ II.B; Site-Specific Plan by Wehran; 1993 EPA Action Mem. at pp. 2 & 5.  Sampling by NYSDEC and the EPA showed that PCB levels in the soil and inside the building were high.  Pl.'s 7.1 Statement at ¶¶ 34 & 35.  The Defendants state that only one soil test conducted by the EPA was "above the NY State's action level for PCB's" and the location where the level was found to be above normal was not one where the EPA expended a lot of funds in its removal action.  Stone Aff. II at ¶ 8.  However, liability may be imposed regardless of the quantity and concentration of the hazardous substance. *See Alcan I*, 97 F. Supp. 2d at 275 n.31 (citing, *inter alia*, 42 U.S.C. § 9601(14)).  Therefore, the second element is satisfied.

The third element presented is whether the release or threatened release of the hazardous substance has caused the USA to incur response costs that were necessary and consistent with the NCP.  Plaintiff has incurred costs associated with not only the removal action, but also with the investigative stage of the removal action.  In 1992 and 1993, the Real Property was evaluated and assessed for any contamination through sampling and analysis of that data by the EPA and

NYSDEC which generated costs for Plaintiff.  Pl.'s 7.1 Statement at ¶¶ 20, 25, 33-35, 37 & 41;

Goldberg-Zoino Report at p. 21; 1992 EPA Action Memo. at p. 1 & ¶ II.B; Site-Specific Plan by

Wehran; 1993 EPA Action Mem. at pp. 2 & 5; NYSDEC Lt. to Stone; EPA Progress Pollution

Report I; EPA Progress Pollution Report II; Notice Lt.  The USA also incurred costs in conjunction

with the removal action including costs for labor by EPA personnel, travel, work performed by

contractors, as well as indirect costs.  Pl.'s 7.1 Statement at ¶ 63; Perera Decl. at ¶¶ 14-15; Velez

Decl., Ex. 1.  The Defendants do admit some costs were expended by the EPA.  Stone Aff. II at ¶¶

14 & 15.  Additionally, the Defendants bear the burden to prove that the government's costs were

inconsistent with the NCP and since the Defendants fail to state that the costs were not consistent

with the NCP, consistency will be presumed.[16]  *See generally* Stone Aff. II; *see also In re Bell*

*Petroleum Servs., Inc.* 3 F.3d at 906 n.22; *E.I. Du Pont*, 341 F. Supp. 2d at 232.

The final element to establish a prima facie case is that the Defendants fall within a class

defined in § 9607(a).  There are four classes in which a defendant may fall:

> 1) the owner and operator of a vessel or a facility, (2) any person who at the time of
> disposal of any hazardous substance owned or operated any facility at which such
> hazardous substances were disposed of, (3) any person who by contract, agreement, or
> otherwise arranged for disposal or treatment, or arranged with a transporter for transport
> for disposal or treatment, of hazardous substances owned or possessed by such person,
> by any other party or entity, at any facility or incineration vessel owned or operated by
> another party or entity and containing such hazardous substances, and (4) any person
> who accepts or accepted any hazardous substances for transport to disposal or treatment
> facilities, incineration vessels or sites selected by such person, from which there is a
> release, or a threatened release which causes the incurrence of response costs, of a
> hazardous substance.

42 U.S.C. § 9607(a)(1)-(4).

Here, the Defendants fall within § 9607(a)(1), as they are the owners or operators of a facility and,

---

[16] Defendants also fail to assert that the EPA acted arbitrarily and capriciously when choosing the response action of a removal action.  *See generally* Stone Aff. II.

as previously noted, it is established that the Real Property is a "facility." *See supra* pp. 14-15. We further note that Stone is the owner and operator of Timmons, owning one hundred percent of the stock in the company and is the only employee. Pl.'s 7.1 Statement at ¶¶ 3, 6, 7, & 8; Stone Aff. II at ¶ 17. Therefore, the final element to establish liability has been fulfilled and strict liability can be imposed. *See Commander Oil Corp.*, 215 F.3d at 327.

The Defendants claim that the USA was responsible for the contamination when the government owned the property during World War II and that they sold the site without removing the transformers. Stone Aff. II at ¶ 5. Additionally, the Defendants state that the prior owners, the Adirondack Steel Casting Company, Inc., used the transformers on the Real Property and that the PCB contamination was not a result of any action by Timmons. *Id.* at ¶¶ 6, 7, 14, & 18. Notwithstanding Defendant's purported defense, if a party falls within § 9601(a)(1), as Timmons does, liability may be imposed on the current owner even if contamination occurred prior to the purchase of the property by that party and even if it has not been shown that the current owner caused the release of the hazardous substances. *See Manzo*, 182 F. Supp. 2d at 397; *supra* p. 11. Therefore, despite the Defendants' claims that they were not responsible for the contamination and that the USA and others were responsible, liability may be imposed on Timmons.

Since a lawsuit is authorized under § 9607(a) and a prima facie case has been established, the Defendants are liable under CERCLA for "all costs" associated with the removal action brought by the government that are consistent with the NCP. 42 U.S.C. § 9607(a)(4)(A)-(D). The costs recoverable are for oversight, investigations, sampling, administration, attorneys' fees, and prejudgment interest. *United States v. 175 Inwood Assocs., LLP*, 330 F. Supp. 2d at 234; *Alcan I*, 97 F. Supp. 2d at 275; *E.I. Du Pont*, 341 F. Supp. 2d at 239. DOJ enforcement costs are also

included. *E.I. Du Pont*, 341 F. Supp. 2d at 240.  In support if its claim, Plaintiff submits seventy-nine (79) pages of documentation associated with the removal action.  Velez Decl., Ex. 1.  Under the Cost Recovery Package #1 for the EPA, payroll costs, indirect costs, travel costs, emergency and rapid response services contract, emergency removal cleanup contract, enforcement support services contract, other expenditures, and the technical assistance team contract totaled $938,269.71 for the period of September 4, 1992 through October 3, 2001.[17]  *Id.*  Under the Cost Recovery Package #2 for the EPA, the payroll costs, indirect costs, enforcement support services contract, and other expenditures totaled $10,753.49 from October 4, 2001 through February 28, 2003.  *Id.*  Under the Superfund Cost Organization Recovery Package Imaging and On-Line System ("SCORPIOS") Report for the EPA, payroll costs, indirect costs, travel costs, enforcement support services contract, other expenditures, and miscellaneous costs totaled $32,730.56 for March 1, 2003 through April 30, 2005.  *Id.*  Thus, the total expenditures by the EPA were $981,753.76.  EPA's calculation of interest beginning on October 31, 2001 to June 30, 2005 total $73,299.71.[18]  Dkt. No. 20, Ann Macaluso Decl., dated June 28, 2005, App. 33 at ¶¶ 6, 7, & Ex. 1.  DOJ's direct labor costs, other direct costs, indirect costs, and prejudgement interest total $191,346.52 from the fiscal years 2003-2005.  Dkt. No. 20, William Kime Decl., dated June 29, 2005, App. 30 at ¶¶ 11, 12, & Ex. 1.  Therefore, the total, including interest, for the EPA and the DOJ is $1,246,399.99.

Consistent with CERCLA's policies, the EPA, as the lead agency, has sufficiently supplied documentation that provides an accounting of the costs incurred with the removal action.  *See* 40

---

[17] The figures were broken down by employee, year, and contract.  Velez Decl., Ex. 1.

[18] The yearly interest rates are as follows: 1) 6.18% for 2001; 2) 3.35% for 2002; 3) 1.47% for 2003; 4) 1.27% for 2004; and 2.21% for 2005.  Dkt. No. 20, Ann Macaluso Decl., dated June 28, 2005, App. 33 at ¶ 6.

C.F.R. § 300.160(a)(1).  These figures were not controverted by the Defendants as being

inconsistent with the NCP.  Additionally, since all material facts presented by the Plaintiff were

undisputed and therefore deemed admitted and Defendants are unable to show by a preponderance

of the evidence the existence of an affirmative defense under § 9607(b), the USA has made a prima

facie entitlement to summary judgment on the issue of liability.  *See Cooper Indus., Inc.*, 1997 WL

135925, at *2; *see infra* Part II.C.

### C.  Affirmative Defenses

The USA seeks to have the affirmative defenses asserted by the Defendants struck as legally

insufficient, factually unsupported, and unavailable under CERCLA.  Pl.'s Mem. of Law at pp. 31-

39.  Defendants set forth nineteen (19) affirmative defenses which are as follows: as to Count One

in the Complaint for failure to respond to the Request, 1) failure to fully respond to the Request was

due to illnesses and injuries suffered by Stone and his family members; and 2) all documents in the

possession and control of Stone pertaining to the Request were provided to the DOJ and a good faith

effort was made; as to Count Two in the Complaint for cost recovery, 1) Timmons and Stone are not

owners nor operators of a facility pursuant to § 9607(a); 2) any hazardous substances were produced

or disposed of by the former owner of the Real Property and possibly by the Government as part of

its "war effort;" 3) any hazardous substances released on the Real Property were due to individuals

who broke into the property and that any release was *de minimus*; 4) Plaintiff has failed to state a

cause of action; 5) any damages were as a result of Plaintiff's own negligence; 6) Plaintiff failed to

mitigate any damages alleged; 7) any damages were caused by others with whom the Defendants

had no "contract, control or responsibility;" 8) the causes of actions are barred by the statute of

limitations; 9) that if liability is found, it should be predicated upon "the extent and degree to which

the alleged release contributed to the overall remediation effort[;]" 10) Plaintiff's claims are barred by the doctrine of unclean hands; 11) the relief is barred by the doctrine of laches; 12) the claims are barred by the doctrines of waiver or estoppel; 13) no causation exists between the Defendants' actions or omissions and the alleged contamination; 14) damages are barred by the doctrine of unjust enrichment; 15) damages were not foreseeable; 16) Defendants exercised due care with respect to foreseeable acts or omissions of others and their consequences; and 17) Plaintiff's damages are excessive and unjustified.  Dkt. No. 3, Answer.

42 U.S.C. § 9607(b) delineates the defenses that are available to a defendant when a cause of action alleges liability under CERCLA.  No liability will be assessed if, by the preponderance of the evidence, a person can show that the release, or threat of it, of the hazardous substance and the damages resulting were caused solely by:

> 1) an act of God; 2) an act of war; 3) an act or omission of a third party other than an employee or agent of the defendant or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions or 4) any combination of the foregoing []."

42 U.S.C. § 9607(b)(1)-(4).

Here, neither the affirmative defense of an act of God nor an act of war is applicable.[19]  As to the Defendants' two affirmative defenses regarding Count One of the Complaint, both are disposed

---

[19] Although Stone claims that the property was used in 1940 for World War II when there could have been PCB contamination, this claim is irrelevant to the current situation since sixty-five years have passed since that event.  Stone Aff. II at ¶ 5.

of and do not fall within the purview of § 9607(b).  *See infra* Part II.F.  With regard to the seventeen

remaining affirmative defenses as to Count Two of the Complaint, affirmative defenses one, two,[20]

four, five, six, eight, nine, ten, eleven, twelve, fourteen, and seventeen fail as they do not comport

with the defenses available under § 9607(b).  *See State of California v. Neville Chem. Co.*, 358 F.3d

661, 672 (9th Cir. 2004) (holding "statutory defenses are exclusive" and equitable defenses are not

available under § 9607); *see also Blasland, Bouck & Lee, Inc. v. City of North Miami*, 283 F.3d

1286, 1304 (11th Cir. 2002) (holding equitable defenses are barred by CERCLA); *Town of Munster

v. Sherwin-Williams Co.*, 27 F.3d 1268, 1270 (7th Cir. 1994) (same); *Velsicol Chem. Corp. v.

Enenco, Inc.*, 9 F.3d 524, 530 (6th Cir. 1993) (same); *Gen. Elec. Co. v. Litton Indus. Automation

Sys., Inc.*, 920 F.2d 1415, 1418 (8th Cir. 1990) (stating CERCLA does not provide an "unclean

hands" defense) (questioned on other grounds in *Key Tronic Corp. v. United States*, 511 U.S.

809(1994)); *United States v. Occidental Chem. Corp.*, 965 F. Supp. 408, 416 (W.D.N.Y. 1997)

(noting defense of unclean hands unavailable); *State of New York v. Almy Bros.*, 971 F. Supp. 69, 73

(N.D.N.Y. 1997) (commenting the defense of laches and mitigation of damages not available under

§ 9607(b)).

Affirmative defenses three, seven, thirteen, fifteen, and sixteen pled by the Defendants

attempt to assert the third party defense under § 9607(b)(3), which must be proved by a

preponderance of the evidence.  Affirmative defense three claims that any release of hazardous

substances was due to other individuals who trespassed upon the property.  To claim an act or

omission of a third party other than employee or agent of the defendant, the release or threat of

---

[20] As to the second affirmative defense for liability by the previous owner, the Defendants may bring a
contribution action but may not assert that claim as an affirmative defense under § 9607.  *See supra* n.17.

release and resulting damages must have been **solely** caused by that third party.  In addition, the

defendant must establish by a preponderance of the evidence that due care with respect to the

hazardous substance was exercised and that precautions were taken against foreseeable acts or

omissions and consequences of the third party.  Here, Defendants have not shown by a

preponderance of the evidence that the release or threatened release was solely caused by a third

party.  The Defendants were aware that the hazardous substances were on the Real Property as

evidenced by their review of the Scalise-Knysh Report and the Goldberg-Zoino Report prior to the

purchase of the property, and therefore assumed the corresponding risk.  Pl.'s 7.1 Statement at ¶ 23;

Goldberg-Zoino Report at pp. 7 & 41; Scalise-Knysh Report at p. 10.  Furthermore, if there were

security breaches and trespassers on the Real Property, there were no due precautions in place as

there was not adequate fencing surrounding the area.[21]  Pl.'s 7.1 Statement at ¶ 26, 27, 28, 30, 31, &

32; 1993 EPA Action Mem. at pp. 3 & 6.  Therefore, it cannot be said that a third party was the sole

contributor to the release or threatened release of hazardous substances.

Affirmative defense number seven states that damages were caused by third parties with

whom the Defendants had no "contract, control, or responsibility."  Again, the Defendants have not

proved the third party defense by a preponderance of the evidence.  For the same reasons affirmative

defense five failed, so must affirmative defense seven.  The Defendants cannot show that the release

or threatened release was solely caused by the third parties.

With respect to affirmative defenses thirteen, that there is no causation between the

Defendants' action and contamination, fifteen, that damages were not foreseeable, and sixteen, that

the Defendants exercised due care with respect to foreseeable acts or omissions and the

---

[21] The Defendants were aware of at lease one incident of a trespasser.  Stone Aff. II at ¶ 9.

consequences, they must fail as well.  At the very least there is some causation between the

Defendants' actions or omissions and the contamination of the surrounding soil and transformer

areas with PCBs.  The Defendants were aware that PCBs existed in the fluids contained in the

transformers in 1989, when the property was purchased.  Pl.'s 7.1 Statement at ¶¶ 15 & 18.  In

subsequent years it was found that the soil near the transformers had been contaminated and that

fluid had been leaking onto the lower portions of the transformers.  *Id.* at ¶¶ 20, 24, 25, 33, 34, &

35; Goldberg-Zoino Report at p. 21; 1993 EPA Action Mem. at pp. 2, 5; 1992 EPA Action Mem. at

p. 1 & ¶ II.B.  In regards to foreseeability, the Defendants were clearly aware of the possibility of

contamination from the release of PCBs.  The 1989 assessment gave them clear notice of the PCBs

and other reports and soil samples taken in years to follow confirmed the existence of PCB and its

levels.  Pl.'s 7.1 Statement at ¶¶ 15, 18, 19, 20, 24, 25, 33, 34, & 35; Goldberg-Zoino Report at pp.

7, 8, 21, & 41; 1993 EPA Action Mem. at pp. 2 & 5; 1992 EPA Action Mem. at p. 1 & ¶ II.B;

NYSDEC Lt. to Stone.  Moreover, damages resulting from contamination were foreseeable.

Additionally, as stated above, Defendants did not exercise due care as they impeded the EPA's

prompt investigation when the Request went unanswered for years and failed to take any action with

regard to possible exposure to the surrounding residents.  Pl.'s 7.1 Statement at ¶¶ 26, 27, 28, 29,

30, 31, 32, 42-47; 1993 EPA Action Mem. at pp. 3 & 6.

        In addition to the third-party defense under § 9706(b)(3), the defendant may assert an

"innocent landowner" defense.  In order to plead this defense, the owners of the property must

show, "by a preponderance of the evidence, that the disposal of the hazardous substances occurred

before they purchased the property, and that at the time of acquisition they 'did not know and had no

reason to know' that the substances had been disposed at the facility."  *United States v. A & N*

*Cleaners and Launderers, Inc. et al.*, 842 F. Supp. 1543, 1547 (S.D.N.Y. 1994) (quoting 42 U.S.C. § 9601(35)). The "innocent landowner" can qualify for this defense if they undertook "'all appropriate inquiry' into the previous ownership and uses of the property, consistent with 'good commercial or customary' practice at the time of transfer." *Id.* (quoting 42 U.S.C. § 9601(35)(B)). The "good commercial or customary" practice, though not defined by statute, has been interpreted to mean that "'a reasonable inquiry must have been made in all circumstances, in light of best business and land transfer principles.'" *Id.* (quoting H.R. Rep. No. 99-962, 99th Cong., 2d Sess., at 187 (1986)). To determine if the landowner complied with the practice, the court considers specialized knowledge attained by the defendant on the subject, "whether the purchase price indicated awareness of the presence of a risk of contamination, commonly known or reasonable information about the property," any obvious contamination on the property, and "the ability to detect such contamination by appropriate inspection." *Id.* (citing 42 U.S.C. § 9601(35)(B)).

Defendants cannot prove by a preponderance of the evidence that they are entitled to the "innocent landowner" defense. To the extent that the Defendants assert the "innocent landowner" defense in affirmative defenses three, seven, thirteen, fifteen, and sixteen, the Defendants would have to show that the disposal of hazardous substances occurred before purchase and at the time of purchase they had no knowledge of the substances that had been disposed of upon the property. Defendants could also have had to make an appropriate inquiry into the prior ownership of the property in light of good commercial practice. At the time of purchase, the Defendants examined the Goldberg-Zoino Report which showed the existence of PCBs and stated that the area around the transformers was a PCB "hot spot." Pl.'s 7.1 Statement at ¶¶ 15 & 18; Goldberg-Zoino Report at p. 41. Because it may be said that an appropriate inquiry was made by Defendants that were consistent

with a good commercial practice, considering they viewed these two reports prior to purchase, the Defendants cannot claim they were "innocent" as they had knowledge of the existence of PCBs at the facility at the time of purchase.  Pl.'s 7.1 Statement at ¶ 23; Interrogatory Response at ¶ 5.

Although affirmative defense eight does not fall within those allowed under § 9607(b), this Court will nevertheless address the statute of limitations defense.  If a party is suing for removal costs under § 9706(a), the applicable period of the statute of limitations is three years from the completion of the removal action.  42 U.S.C. § 9613(g)(2)(A); *see also Syms v. Olin Corp.*, 408 F.3d 95, 102 (2d Cir. 2004).  Tolling agreements between parties to defer the running of the statute of limitations have been upheld in many cases.  *See Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 161 (2d Cir. 2003); *United States v. Fischer*, 93 F.2d 488 (2d Cir. 1937); *Herbert Ltd. P'ship v. Elec. Arts, Inc.*, 325 F. Supp. 2d 282, 285, & 292 (S.D.N.Y. 2004); *New York ex rel. Spitzer v. Feldman*, 2003 WL 21576518 (S.D.N.Y. July 10, 2003).

The removal action was completed on December 4, 1999, which means that the USA would have to bring a lawsuit by December 4, 2002.  Pl.'s 7.1 Statement at ¶ 41; Notice Lt. at p. 1; Perera Decl. at ¶¶ 8 & 14.  However, the USA executed three tolling agreements with the Defendants, signed by Stone on behalf of all Defendants.  The first was executed on October 20, 2002, which was to be effective until March 31, 2003.  Dkt. No. 20, Tolling Agreement I, App. 35.  The second tolling agreement was signed on March 11, 2003, by Stone on behalf of himself and Timmons and was subsequently signed on March 18, 2003, by the EPA to be effective until May 30, 2003.  Dkt. No. 20, Tolling Agreement II, App. 36.  The third and final tolling agreement was signed on May 22, 2003, once again by Stone on behalf of himself and Timmons and on May 28, 2003, by the EPA, which was effective until July 31, 2003.  Dkt. No. 20, Tolling Agreement III, App. 37.   All three

agreements stated that the statute of limitations would not run until the last date stated in the agreement, which would be July 31, 2003.  Tolling Agreement I at ¶ 6; Tolling Agreement II at ¶ 6; Tolling Agreement III at ¶ 6.  Therefore, suit would have to be brought by July 31, 2006; the current Complaint was filed on July 29, 2003, clearly within the allotted time.[22]  *See* Compl.

For the foregoing reasons, the Defendants affirmative defenses all fail.

### D.  Declaratory Relief

Plaintiff states that if the Defendants are found liable under CERCLA, a declaratory judgment should be entered in its favor.  Pl.'s Mem. of Law at pp. 23-24.

42 U.S.C. § 9613(g)(2) states that "[i]n any such action [for natural resource damages], the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  The Second Circuit, quoting the Sixth Circuit, has stated that "'in providing for the recovery of response costs, Congress included language to ensure that a responsible party's liability, once established, would not have to be relitigated. . . . The entry of declaratory judgment as to liability is mandatory. The fact that future costs are somewhat speculative is no bar to a present declaration of liability.'" *State of New York v. Green*, 420 F.3d 99, 111 (2d Cir. 2005) (quoting *Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 844 (6th Cir. 1994)) (further citations omitted).  Since liability is established against the Defendants, the USA is entitled to an entry of a declaratory judgment.

---

[22] The third tolling agreement stated that suit would not be brought prior to June 27, 2003, and therefore filing suit on July 29, 2003 was proper.  Tolling Agreement III at ¶ 8.

## E.  *In Rem* Action

The USA seeks a judgment against the Real Property for costs associated with the removal

action in order to sell the property for reimbursement purposes.  Compl. at ¶ 51.

Under 42 U.S.C. § 9607(l)(1), the United States may obtain a lien, for costs and damages if a

person is liable, "upon all real property and rights to such property which (A) belong to such person;

and (B) are subject to or affected by a removal or remedial action."  These costs "may be recovered

in an action in rem in the United States district court for the district in which the removal or

remedial action is occurring or has occurred."  42 U.S.C. § 9607(l)(4).  The lien continues until all

liability for the costs are satisfied.  *Id.* at § 9607(l)(2).

Here, the Real Property in question belongs to Timmons and Stone, both qualifying as

"persons" subject to an *in rem* action.[23]  Pursuant to § 9607(l)(2), Plaintiff sent Timmons and Stone

the notice of potential liability and the notice of the EPA's intent to file a lien.  Pl.'s 7.1 Statement at

¶¶ 48 & 49; Notice Lt.  Since no response was received from the Defendants, the Notice of Lien on

the Real Property was filed in Albany County, New York on December 10, 2001.  Pl.'s 7.1

Statement at ¶ 50.  This *in rem* claim was also included in the Complaint filed on July 29, 2003, but

Defendants do not address it in any form.  *See* Compl. at ¶¶ 42-51; *see generally* Stone Aff. II.

Therefore, the USA, pursuant to § 9607(l), is hereby entitled to obtain a lien against the Real

Property for outstanding costs.

## F.  EPA Request for Information

The USA alleges that Timmons and Stone failed to comply with the EPA Request for

---

[23] A "person" is defined as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body."  42 U.S.C. § 9601(21).

Information.  Compl. at ¶ 33.  The USA seeks a court order against Timmons and Stone requesting both to fully comply with the Request and that civil penalties be imposed for their failure to comply with the Request.  *Id.* at ¶ 36.  Defendants claim that they have fully complied with the Request, albeit the compliance was tardy.  Stone Aff. II at ¶¶ 16 & 17.

Pursuant to 42 U.S.C. § 9604(e)(2), "any officer, employee, or representative [duly designated by the President] may require any person who has or may have information relevant to [certain questions] to furnish, upon reasonable notice, information or documents relating to such matter."  These questions include: "(A) [t]he identification, nature, and quantity of materials which have been or are generated, treated, stored, or disposed of at a . . . facility or transported to a . . . facility[;] (B) [t]he nature or extent of a release or threatened release of a hazardous substance or pollutant or contaminant at or from a . . . facility[;] and (C) [i]nformation relating to the ability of a person to pay for or to perform a cleanup.  42 U.S.C. § 9604(e)(2).  A "person" in reference to § 9604(e)(1) includes, *inter alia*, individuals and corporations.  42 U.S.C. § 9601(21).

There is a consequence for failure to provide the requested information.  Liability for failure to provide the requested information will stand if it is shown, by a preponderance of the evidence, that: 1) the information request was issued by an officer, employee or representative designated by the President; 2) the information was "directed to a 'person'" under CERCLA; 3) the information "was issued for the purpose of determining the need for a response action under CERCLA, choosing or taking any such response action, or otherwise enforcing the provisions of CERCLA[;]" and 4) the information requested fell within the scope of § 9604(e)(2)(A)-(C).  *United States v. Ponderosa Fibres of Am., Inc.* 178 F. Supp. 2d 157, 161 (N.D.N.Y. 2001) (citing 42 U.S.C. §§ 9604(e)(1), 9601(21), & 9604(e)(2)).

If the person unreasonably fails to comply with the request, "the court may assess a civil

penalty not to exceed $25,000 for each day of noncompliance[.]"  *Id.* at 161.  Effective January 30,

1997, the penalty increased to $27,500.  61 Fed. Reg. 69360 (Dec. 31, 1996).  On March 15, 2004,

the rate was further amended to $32,500.  69 Fed. Reg. 7121 (Feb. 13, 2004).

Whether or not a defendant intentionally, unintentionally, or willfully failed to comply in

whole to the questions issued is irrelevant as no *mens rea* is required under 42 U.S.C. 9604(e).

*Ponderosa*, 178 F. Supp. 2d at 162-63.  The government need only show that the defendant acted

unreasonably by a preponderance of the evidence; the defendant may then rebut the government's

case through an affirmative defense.  *United States v. Barkman*, 784 F. Supp. 1181, 1186 n.3 (E.D.

Pa. 1992); *United States v. Gurley*, 235 F. Supp. 2d 797, 803 (W.D. Tenn.), *aff'd*, 384 F.3d 316 (6th

Cir. 2004).  A defendant's intentions will be applicable when a determination is made as to the

amount of the penalty to be imposed.  *Ponderosa*, 178 F. Supp. 2d at 163.  The courts, at that time

> look to five equitable factors in calculating the appropriate amount of the penalty
> imposed under 42 U.S.C. § 9604(e)(B)(ii): "1) the good or bad faith of the defendant;
> 2) the injury to the public; 3) the defendant's ability to pay; 4) the desire to eliminate the
> benefit derived by the violation; and 5) the necessity of vindicating the authority of the
> enforcing agency."  *United States v. Martin*, 2000 WL 1029188, at *8 (citing *United
> States v. Crown Roll Leaf, Inc.*, 29 ERC (BNA) 2025, 20 ELR 20297, 20300 (D.N.J.
> 1989 ("Crown II") (citing *United States v. Reader's Digest Ass'n, Inc.*, 662 F.2d 955,
> 967-68 (3d Cir. 1981))).

*Id.* at 163 n.6.

Here, in establishing liability for failure to respond to the Request, Plaintiff must satisfy the

first element in that the information was requested by a duly authorized individual.  In this case, the

EPA Request for Information was issued by Janet Conetta, Strategic Integration Manager,

Emergency and Remedial Response Division of EPA Region 2, and the Notice Letter, which

included the notice for failing to respond to the Request, was issued by Richard L. Caspe, Director,

Emergency and Remedial Response Division of EPA Region 2.  Dkt. No. 20, Pl.'s Mem. of Law at p. 25.  Both individuals were delegated with the authority to require a person to furnish information or documents pursuant to § 9604(e)(1).  *Id.*  The questions posed by Conetta and Caspe were also those authorized under § 9604(e)(2).  *See supra* n.11.

The second element is that the Request be directed to a "person" under CERCLA.  As previously stated, Timmons and Stone fall within the definition of "person."  42 U.S.C. § 9601(21); *see supra* Part II.E.  Thus, the second element is satisfied.

For the third element, Plaintiff must show that the Request was issued to determine the need for a responsive action, to take action, or to enforce provisions of CERCLA.  The October 23, 2000 Request sought information about the Real Property and its purchase as well as financial information to assess whether Timmons or Stone would be able to pay the costs associated with a removal action.  Pl.'s 7.1 Statement at ¶ 42; Notice Lt.  The information requested included identification of spills, leaks or threats of release of hazardous substances, prior site examinations, details of environmental activities conducted by Timmons, and the relationships with other parties that might be responsible.  Pl.'s 7.1 Statement at ¶ 43; *see supra* n.11.  Such requested information would trigger a removal action, therefore, the third element is also satisfied.

The fourth and final element, which is tied into the third element, to establish liability is that information requested fell within the scope of § 9604(e)(2)(A)-(C).  The questions presented in § 9604(e)(2)(A)-(C) were similar to those in the Request which were presented to Timmons and Stone.  *Compare* § 9604(e)(2)(A)-(C) *with supra* n.11.  Section 9604(e)(2)(A)-(C) asks such questions as the identity of materials stored or disposed of at the site, the nature or extent of a release of hazardous substances at the site, and whether a defendant is able to pay for a response

action.  As previously noted, those inquiries were in the EPA Request.  *See supra* n.11.

Accordingly, all of the elements to establish liability for failing to respond to the EPA

Request have been proved by a preponderance of the evidence.  Since the USA asks for civil

penalties to be assessed, it must be determined whether Timmons and Stone unreasonably failed to

comply with the Request.  It is uncontested that Timmons and Stone failed to provide a response to

the Request within the time period allotted; moreover, over 1,300 days had passed without

compliance.  Stone Aff. II at ¶ 17; Pl.'s Mem. of Law at p. 29.  The initial Request was sent on

October 23, 2000, and after no response was received, on January 19, 2001, a two-week extension

was granted primarily due to family medical problems of Defendant Stone.  Notice Lt. at p. 3.  No

information was provided until October 2003 and the only information given was in the form of

several tax returns and financial statements.  Pl.'s 7.1 Statement at ¶¶ 44-47.  Defendant states that

there was full compliance with the Request although there was a substantial delay.  Stone Aff. II at

¶¶ 16-17.  However, the Defendants provide no documentation to show there was full compliance.

*See generally* Dkt. No. 26.

Stone, though admitting that there was a failure to respond timely, proffers excuses as to

why a significant delay occurred between the date the request was made and the date of his

compliance.  Stone Aff. II at ¶ 17.  Stone states that during the course of the demand, his wife was

dying, his mother was dying, his business was failing, he had no other employees, and his own

health was failing as he had open heart surgery in March 1992, subsequently was in a severe car

accident where he broke his neck in December 2002, and then had a stroke on March 15, 2005.  *Id.*

Based on the duration of the delay, this Court finds that the non-compliance was

unreasonable as a matter of law.  *See Barkman*, 784 F. Supp. at 1190 (700 days to answer is

unreasonable); *see also United States v. Martin*, 2000 WL 1029188, at *8 (N.D. Ill. July 26, 2000) (607 days to answer is *per se* unreasonable). Although intention in failing to comply has no bearing, intentions are applicable in determining the penalties to be assessed.

Stone asserts that at all times he acted in good faith to supply the information in a timely manner but that it was difficult to provide information even to his attorney. Stone Aff. II at ¶ 17. These difficulties, as Stone proffers, arose out of the illnesses of his family members and himself. *Id.* Despite Stone's claim that he acted in good faith, the EPA gave him several opportunities to respond to the Request as well as provided an extension because of his and his family's medical problems. It is also interesting to note that the extension was given approximately three months after the Request was first issued. Notice Lt. at p. 3. Furthermore, Stone's attorney was available to aid in providing the information timely and yet incomplete information was given to the EPA nearly three years later. Notwithstanding the medical difficulties encountered by Stone, there are yearly gaps between the dates of the surgery, car accident, and stroke. Stone Aff. II at ¶ 17. Similarly, the time periods for the illnesses to his mother and wife are not provided. *Id.* Within the period of October 2000 until October 2003, Stone clearly had an opportunity to comply. Stone's excuses do not render the delay reasonable. Therefore, it cannot be said that Stone acted in good faith. *See Martin*, 2000 WL 1029188, at *8-9 (citing *United States v. Crown Roll Leaf, Inc.*, 20 ENVTL. L. REP. 20297, 20300 (D.N.J. Apr. 28, 1989)); *Gurley*, 235 F. Supp. 2d at 806.

The second factor the Court must examine is the injury to the public. A potential injury to the public is enough to satisfy the second factor. *Martin*, 2000 WL 1029188, at *9 (citation omitted). Delaying the investigation and clean-up efforts also constitute injury to the public. *Id.* This is the case here because the public is "denied full disclosure of the facts pertaining to the direct

contact and environmental threats[.]"  *Id.*.  Furthermore, the delay in providing information to the Request makes it more difficult for the EPA to "perform a more focused and specified site investigation[,]" thereby "precluding the EPA from allocating [Superfund dollars], at least until a cost recovery action replenished the Superfund, to other Superfund locations" and "leaving the public exposed for longer than necessary to hazardous waste" at these other locations.  *Gurley*, 235 F. Supp. 2d at 807 (citations omitted).  Thus, harm results to the public through "lack of access to . . . useful information [that can] result[] in a cleanup effort that [is] less efficient and economical[.]"  *Id.*  The Defendants' failure to provide the information in the Request in, at the very least, a timely manner impeded the EPA from conducting a full and accurate investigation.  The removal action may also have been inefficient and less economical than normal as the substantial delay caused the EPA to incur extra costs it may not have had to expend.  Additionally, the PCBs located on the Real Property could have a harmful effect on the surrounding residents.  As noted previously, children, bike riders, and trespassers could be exposed to the PCBs, which is an apparent public injury.  Pl.'s 7.1 Statement at ¶¶ 26-32.  For all the foregoing reasons, there has been an injury to the public.

Another factor this Court must examine is the desire to eliminate the benefit derived by the defendant.  "The potential benefit to the [defendant] from failing to respond is measured both in the savings of time and money needed to respond and in the potential savings to [the defendant] in evading liability by not providing information which may show it is liable for the costs of cleaning up the [contaminated] site."  *Martin*, 2000 WL 1029188, at *9 (citing *Crown Roll Leaf, Inc.*, 20 Envtl. L. Rep. at 20301) (alterations in original); *see also Gurley*, 235 F. Supp. 2d at 808.  Here, essentially Timmons and Stone have saved at least money by failing to respond and by providing insufficient or non-existent responses, although Stone does claim that Timmons paid a contractor

*-33-*

for some of the removal work done.[24]  Stone Aff. II at ¶¶ 10 & 14.  Further, Timmons and Stone

may also have benefitted from evading liability thus far on costs associated with the contamination

through the failure to provide information to the Request.  However, Timmons and Stone may not

ultimately benefit as "any gain from the delay could be offset by charging . . . interest for the period

during which [Timmons and Stone were] liable."  *Gurley*, 235 F. Supp. 2d at 808 (citing *Barkman*,

784 F. Supp at 1190).  Although this factor still favors the EPA, it is so to a lesser degree than the

other factors analyzed by the Court.

The next factor to be examined is the necessity to vindicate the authority of the enforcing

agency.  Courts have found that "[w]ithout the ability to gather information and documents, the EPA

would be handicapped in its ability to enforce CERCLA."  *Martin*, 2000 WL 1029188, at *9 (citing

*United States v. Charles George Trucking, Co.*, 823 F.2d 685, 689 (1st Cir. 1987)); *see also Gurley*,

235 F. Supp. 2d at 808; *Crown Roll Leaf, Inc.*, 20 ENVTL. L. REP. at 20301 ("The most important

factor in this case supporting the imposition of a significant civil penalty is the need to support the

authority of EPA in matters such as this . . . .  A significant penalty is necessary to underscore the

seriousness of the information gathering authority of EPA and to ensure it is not ignored as it was by

Crown in this case.").  Furthermore, "to allow an unreasonable denial to go unpunished entirely

would encourage others to" not comply with agency requests, thereby impeding "the agency's

---

[24] Stone states that Timmons paid $382,000 to a contractor for remediation work and that it authorized the EPA to undertake the removal action for $140,000 while Timmons would fund the drafting of the remediation plan.  Stone Aff. II at ¶¶ 10 & 14.  CERCLA provides for a private party to "pursue contribution or indemnification from potentially responsible parties for expenses incurred responding to environmental threats[.]"  *Commander Oil Corp. v. Barlo Equip. Corp.*, 315 F.3d 321, 326 (2d Cir. 2000) (citing 42 U.S.C. § 9607(a)(4)(B)).  If the party is deemed "innocent," that party may seek indemnification.  *AMW Materials Testing, Inc. et al. v. Town of Babylon et al.*, 348 F. Supp. 2d 4, 11 (E.D.N.Y. 2004) (citing *Bedford Affiliates v. Sills*, 156 F.3d 416, 424 (2d Cir. 1998)).  In the alternative, if the party may be deemed liable, then the party can only seek contribution "for those costs exceeding its pro rata share of the cleanup expenditure."  *Id.* (citing *Bedford Affiliates*, 156 F.3d at 424).  Therefore, Defendants may choose to pursue a contribution claim if they so desire, but the amount paid by them has no bearing as to the analysis of civil penalties nor has any regard to any affirmative defenses.

ability to remedy problem sites[.]" *Gurley*, 235 F. Supp. 2d at 808 (quoting *United States v. Taylor*, 1994 WL 695918, at *4 (W.D. Mich. May 18, 1994)) (internal quotation marks omitted).  This Court agrees with *Martin* and *Gurley* in that a civil penalty is necessary to deter other parties from attempting to evade the authority of the EPA to make the Request.

The final factor to be considered is the defendant's ability to pay.  The Court is confounded in assessing this final factor.  The Court has not been provided with any documentation on the Defendants' current financial situation.  The only information possessed by this Court is the amount of money received by the Defendants when portions of the original land purchased were sold in 1998 and 1999 and financial information from a tax return in 1993.  Despite this lack of financial information, other courts have assessed penalties when vague financial disclosures were provided. *See Martin*, 2000 WL 1029188, at *10 (citing *In the Matter of LaBarge, Inc.*, 1997 EPA ALJ LEXIS 6, at *10 (EPA Mar. 26, 1997) for the proposition that an assumption is made that the defendant could afford the amount proposed when the defendant did not provide current financial information under the Clean Water Act).  Although a civil penalty of $32,500 may be assessed per day of noncompliance, other courts have proposed penalties of $2,000, $1,000, $500, $75, and $55 per day depending on the situation. *See Martin*, 2000 WL 1029188, at *10; *Gurley*, 235 F. Supp. 2d at 808-09; *Barkman*, 784 F. Supp at 1190.  Although this Court could follow the steps taken by other courts who were provided scant financial information in order to assess the defendant's ability to pay the civil penalties, we decline to do so.  It is our view that review of some relevant financial information is still warranted before the Court determines the amount of the civil penalty imposed as based upon Defendants' ability to pay.  Therefore, both Plaintiff and Defendants shall provide further pertinent information as directed below.

## III.  CONCLUSION

For the reasons stated herein, it is hereby

**ORDERED**, that the Plaintiff's Motion for Summary Judgment (Dkt. No. 20) is

**GRANTED**; and it is further

**ORDERED**, that the Defendants pay costs and interest totaling $1,246,399.99; and it is

further

**ORDERED**, that a declaratory judgment be entered for the Plaintiff; and it is further

**ORDERED**, that Plaintiff shall file with this Court's Chambers all of the financial

information it received from Defendants in response to the Request for Information within twenty

(20) days of this Order.  Defendants may file with this Court any further financial information that

will assist the Court in determining Defendants' ability to pay the civil penalty; and it is further

**ORDERED**, that the Defendants fully comply with the EPA Request for Information; and it

is further

**ORDERED**, that a Judgment *in rem* be entered against the Real Property and that the Real

Property be sold.  Plaintiff shall submit a proposed order with the terms of the sale pursuant to 28

U.S.C. § 2001 *et seq.*


Date:   February 8, 2006
   Albany, New York

                           RANDOLPH F. TREECE
                          United States Magistrate Judge